Filed 12/28/23  P. v. Booker CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DONALD EARL BOOKER,<br><br>      Defendant and Appellant. | B322598<br><br>(Los Angeles County<br>Super. Ct. No. GA099455) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Villalobos, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

A jury convicted defendant Donald Earl Booker of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)[1]), attempted murder (§§ 664/187, subd. (a)), and mayhem (§ 203).  As to each offense, the jury found true the allegation that defendant personally inflicted great bodily injury.  (§ 12022.7, subd. (a).)  The trial court found that defendant had two prior serious felony convictions within the meaning of the Three Strikes law (§§ 667, subd. (d) and 1170.12, subd. (b)) and section 667.5, and that he had served six prior prison terms (§ 667.5, subd. (b)).  The court sentenced defendant to 45 years to life in state prison.

Defendant appealed from his conviction.  We conditionally reversed the judgment and remanded to the trial court for it to conduct a mental health diversion eligibility hearing under section 1001.36.  If the court reinstated the judgment, it was to consider whether to exercise its discretion to strike the section 667, subdivision (a) enhancements.  (*People v. Booker* (May 10, 2019, B286842 [nonpub. opn.] (*Booker I*).)

On remand, the trial court found defendant ineligible and unsuitable for section 1001.36 mental health diversion.  It sentenced defendant to 35 years to life in state prison.  Defendant again appeals, contending the court erred in finding him competent to proceed with the hearings on remand, denying mental health diversion, and failing to consider new laws—Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1, (AB 518)) and Senate Bill No. 81 (Stats.2021, ch. 721, § 1, (SB 81))—in making its sentencing choices.  We affirm.

---

[1]    All further statutory citations are to the Penal Code unless otherwise noted.

## II.  BACKGROUND

A.  *Trial Evidence*

The following background is taken from the unpublished opinion in defendant's prior appeal in this case, *Booker I, supra*, B286842:

"Dale Ross had known and been friends with defendant and Treopia Ross for about 20 years.[2]  He testified that at around 9:00 a.m. on August 11, 2016, he and Treopia drank beer and smoked crystal methamphetamine at his house.

"After smoking methamphetamine for about an hour, Dale and Treopia went to the Sparr liquor store.  Defendant was at the parking lot.  Defendant and Treopia spoke.  Dale was close by.  He did not remember hearing defendant tell Treopia that he was going to kill her.

"At some point, Dale saw defendant take a swing at Treopia.  Dale though[t] they were playing, 'like sand boxing or something.'  Defendant and Treopia struggled for about 20 or 30 seconds.  They were swinging at each other—Treopia threw punches.

"During the altercation, Dale did not see either defendant or Treopia in possession of a box cutter.  He had previously seen Treopia with knives—'everybody around there carries knives and stuff.'  He saw her with a knife earlier that day.

"At about 8:46 a.m. on August 11, 2016, Deciderio Flores was driving on Huntington Drive in Duarte.  He saw defendant chasing Treopia.  When defendant got close to Treopia he would

---

"2      Because Dale Ross and Treopia Ross share a last name, we will refer to them by their first names for clarity.

3

'swing[] on' her.  He did not see Treopia swing at defendant.  It appeared that defendant had something that looked like a knife in his hand.  Treopia screamed for help.  Flores believed that Treopia was going to be hurt and called the police.

"Flores testified that Treopia and defendant ran into a liquor store.  At some point, defendant came out and walked swiftly to a Carl's Jr. across the street.

"Treopia testified that she had been convicted of misdemeanor assault with a deadly weapon in 2006 and felony forgery in February 2007.  She had felony charges pending for allegedly striking and pepper spraying her 70-year-old father.

"At about 8:40 a.m. on August 11, 2016, Treopia was at the Sparr liquor store in Duarte.  Defendant was in the parking lot when she arrived.  Treopia called Dale, who she knew was at the Carl's Jr.  At some point, Treopia approached Dale because she wanted to go to his house to dye her hair—she was homeless at the time.

"As Treopia and Dale spoke, defendant said, 'Hey, Dale,' and motioned to Dale to come over.  Dale went to defendant to see what he wanted.  Treopia went into the liquor store and spoke to a store employee for 10 or 15 minutes.

"Treopia then left the store and asked Dale, '"Dale, you ready?"'  Dale appeared not to hear Treopia and so approached her.  Defendant remained behind.  Defendant then asked, '"What you doing talking about me?"'  Dale walked back and forth between Treopia and defendant.  At some point, defendant walked with Dale to Treopia.

"Defendant 'was looking [Treopia] up and down.'  She asked him, '"Why are you maddogging me, looking me up and down like that?"'  Defendant said, in a normal tone of voice, 'Bitch, shut up.

4

I'm going to kill you.' Defendant then swung at Treopia and she put her hand up so he would not hit her in the face. Treopia had not threatened defendant or swung at him.

"Defendant's blow, with a box cutter, made contact with the palm of Treopia's right hand and cut her. Defendant then tried to pull Treopia's hair back and cut her throat. To defend herself, Treopia put her 'hands up, like to square off with him' in a fighting position. Defendant then cut Treopia's left hand, cutting her to the bone.

"Treopia ran into the street and screamed for help and for someone to call the police. Defendant pursued and tried to catch her. Treopia ran inside the Sparr liquor store. Defendant followed her. Treopia asked the liquor store employee to call the police.

"Treopia was taken to the hospital where she had surgery on her hands that lasted five or six hours. She had casts on her hands for two weeks and could not use them. Treopia was in a lot of pain when she left the hospital. She suffered lasting impairment to one of her hands that prevented her from continuing her employment braiding hair.

"Deputy Sheriff Brendon Jackson responded to the Sparr liquor store. There, he spoke with Dale. Dale said he was standing with Treopia in a dirt lot when defendant approached. Treopia asked defendant, 'Why you looking me up and down?' Defendant responded, 'Shut up, bitch; I'll kill you.'" (*Booker I, supra*, B286842.)

B.    *Remand Proceedings*

On September 14, 2021, Dr. Haig Kojian evaluated defendant for section 1001.36[3] mental health diversion.  Dr. Kojian had previously evaluated defendant and was appointed at defense counsel's request.  Prior to the evaluation, defendant stated that he "understood the scope and intent of testing and volunteered to be interviewed."  Dr. Kojian prepared a mental health diversion report for the court in which he concluded that defendant met one of the six criteria for mental health diversion (all criteria had to be met to qualify for mental health diversion (§ 1001.36, subd. (b)(1) ["Pretrial diversion may be granted pursuant to this section *if all* of the following criteria are met"] (italics added)).

In his report, Dr. Kojian opined that defendant met the first diversion criterion—whether he suffered from a qualifying mental disorder.  (§ 1001.36, subd. (b)(1)(A).)  Defendant had a significant history of mental illness including a diagnosis of schizophrenia, treatment with numerous psychiatric medications, and multiple psychiatric hospitalizations.  In September 2015, defendant was "considered to be incompetent to stand trial."  The doctor also noted that defendant had a significant history of methamphetamine use.  During the course of the interview, defendant "ma[d]e a number of strange comments such as that he

---

[3]    Between the time Dr. Kojian made his mental health diversion evaluation and the trial court made its diversion ruling, former section 1001.36 was amended in a way not relevant to this appeal.  (Compare former versions of section 1001.36 at Stats. 2019, ch. 497, § 203, eff. Jan. 1, 2020 and Stats. 2022, ch. 47, § 38, eff. June 30, 2022.)

is '33 degrees Fahrenheit,'—a reference to 33 degree Free Mason, that he walks in the light, and that he follows the light like the Illuminati." Dr. Kojian diagnosed defendant with "Schizoaffective Disorder, Bipolar Type" and "Stimulant Use Disorder—Amphetamine Type."

Dr. Kojian concluded that defendant did not meet the second diversion criterion—whether his mental disorder played a significant role in the commission of the charged offense. (§ 1001.36, subd. (b)(1)(B).) Defendant denied committing the charged offenses and stated that "he was not impaired on the date of the incident . . . and that he knew 'exactly' what was going on . . . [and] wasn't mentally compromised . . . ." Dr. Kojian opined it was "possible that [defendant] may have been under the influence of a psychoactive substance such as methamphetamine which could have caused him to either be delusional or paranoid, and it is also possible that he may have been delusional and paranoid as a result of mental illness but this is only conjecture."

Dr. Kojian believed that defendant did not meet the third diversion criterion—whether his symptoms would respond to mental health treatment. (§ 1001.36, subd. (b)(1)(C).) Dr. Kojian stated, "It's not clear if [defendant's] symptoms would be responsive to treatment. He is, currently, under psychiatric care with Effexor but he continues to demonstrate delusional thinking. It is likely his illness is quite refractory."

Dr. Kojian concluded that defendant did not meet the fourth diversion criterion—whether he consented to diversion and waived his speedy trial right.[4] (§ 1001.36, subd. (b)(1)(D).) According to Dr. Kojian, "[Defendant] reported he is willing to

---

[4] Dr. Kojian labeled this criterion, "Is [defendant] amenable to mental health treatment?"

7

participate in treatment, however, he has, historically, struggled with medication and treatment noncompliance. In addition, I suspect he will be at a very high risk for continuing to use illegal substances which can exacerbate and also cause underlying mental conditions of a psychotic nature. I do believe he is at high risk for both."

Dr. Kojian opined that defendant did not meet the fifth diversion criterion—whether he agreed to comply with treatment.[5] (§ 1001.36, subd. (b)(1)(E).) Dr. Kojian observed, "I believe [defendant] requires ongoing treatment in a confined/closed environment such as prison."

Finally, Dr. Kojian did not believe that defendant met the sixth diversion criterion—whether he posed an unreasonable risk of danger to public safety if treated in the community—i.e., an unreasonable risk of committing a super strike.[6] (§ 1001.36,

---

[5]   Dr. Kojian labeled this criterion, "What form of treatment would be most appropriate?"

[6]   A "super-strike" under section 1170.18, subdivision (c) includes: a sexually violent offense (Welf. & Inst. Code, § 6600, subd. (b)), oral copulation with a child under 14 years of age and more than 10 years younger than the defendant (§ 288a), sodomy with another person under 14 years of age and more than 10 years younger than the defendant (§ 286), sexual penetration with another person under 14 years of age and more than 10 years younger than the defendant (§ 289), a lewd or lascivious act involving a child under 14 years of age (§ 288), any homicide or attempted homicide (§§ 187–191.5), solicitation to commit murder (§ 653f), assault with a machine gun on a peace officer or firefighter (§ 245, subd. (d)(3)), possession of a weapon of mass destruction (§ 11418, subd. (a)(1)), and any serious or violent

subd. (b)(1)(F).)  According to Dr. Kojian, "Given current findings, [defendant's] presentation, and given his risk profile including severely impaired insight and judgment, ongoing delusional mentation despite being psychiatrically treated, and propensity toward being medically non-compliant I don't believe that [defendant] can be safely treated in the community."

Having received Dr. Kojian's mental health diversion report, the trial court held a hearing on October 14, 2021.  The court stated Dr. Kojian had prepared a "pretty thorough analysis" that did not look "too favorable."  Defense counsel responded that he had requested Dr. Kojian be appointed based on Dr. Kojian's prior experience with and evaluation of defendant.  Defense counsel conceded that Dr. Kojian's report was "obviously . . . unfavorable to [defendant] in a number of regards" and asked the court to appoint a different doctor to assess whether there was a suitable program for defendant.  The court denied the request, finding it unnecessary, in part because Dr. Kojian's report "does provide a significant analysis of [defendant's] situation, his mental health disease.  It's clear that he is suffering from mental health disorders."  The court set the matter for a future hearing and resentencing.

At a hearing on February 18, 2022, the trial court asked defendant, "[D]o you know why you're here today?"  Defendant responded, "Yes, I know why I'm here.  [¶]  . . .  [¶]  For mental health diversion and resentencing.  I talked to George Gascon, the head District Attorney.  He said for you guys to take off the prison priors and the prison enhancements."  Defendant made other assertions about his case and his mental health.

---

felony punishable in California by life imprisonment or death. (§ 667, subd. (e)(2)(C)(iv).)

The trial court then said to defendant, "Okay, so I think you pretty much understand as far as why you're here. The court is obligated to consider mental health diversion for you. That was, when the case went up on appeal, your case went up on appeal, that court directed us to consider you for mental health diversion. So you understand that, right?" Defendant responded, "Yes, sir."

The trial court then asked defense counsel if he was raising a doubt about defendant's competence. Defense counsel responded that he did have a doubt about defendant's competence because when he visited defendant earlier in the week on the mental health floor of the jail, defendant seemed very agitated and said he had personally spoken to George Gascon twice about his case. Defendant said, "Exactly." Later, defendant claimed to have spoken with Kamala Harris about his case.

Defense counsel stated that defendant told him that he did not trust him because he was conspiring with the prosecutor. Defendant said, "You were."

Defense counsel added that defendant believed he had been sent to prison for a crime his uncle committed. Defendant denied saying that and added seemingly rambling statements about his case before stating, "He called himself getting retaliation for what my uncle did by punishing me for what my uncle did. When I was a little boy whatever my uncle did, my uncle was responsible for what he did, not me."

In sum, defense counsel stated, it was difficult for him to communicate with defendant about anything substantive. Defendant responded that he did not want to communicate with defense counsel because defense counsel undermined his character and spoke to him as if he was trash.

10

The trial court said to defendant, "So let me just ask you this, we need to go forward. We would like to go forward, but I—"

Defendant interjected, "We can go forward. I have no problem with abiding by anything that you set forth any type of guideline. All I'm asking, you know, to give me an opportunity to prove myself."

The trial court stated, "Okay, all right. So this is a tough call because it seems to me that [defendant] does understand the proceedings. He knows exactly what's going on." The court was inclined to believe defendant was competent but decided, "in the abundance of caution," to declare a doubt as to defendant's competence and have Dr. Kojian examine him. Such an examination could be done expeditiously as Dr. Kojian was thoroughly familiar with defendant. The court set the matter for a later competence hearing.

On March 8, 2022, Dr. Kojian evaluated defendant to determine if he was "competent to stand trial." Prior to the evaluation, defendant stated that he "understood the scope and intent of testing and volunteered to be interviewed."

In his competence report, Dr. Kojian reported that defendant stated he was in prison but had been brought to county jail for resentencing and consideration for mental health diversion. After complaining about his attorney and asserting that he did not want to be considered for transfer to Patton State Hospital, defendant said he was not facing a mental health diversion hearing but a resentencing hearing.

Defendant subsequently "went on a tangential rant about his uncle" and his uncle's supposed crimes and claimed his (defendant's) prosecution was "the system taking revenge on him." Defendant believed the District Attorney, trial court, and

11

his attorney conspired to put him in prison. When asked the basis of the resentencing, defendant responded that he wanted the case dismissed because of a lack of evidence and prosecutorial misconduct.

When Dr. Kojian tried to ask defendant competence-related questions, defendant "became quite tangential and started talking about the [I]lluminati and the Knights Templar as he had in the past. He made unrelated and nonsensical statements about his 'lodge' being in the Milky Way which is also his 'base station' and the 'pillars of Hercules beyond Olympus abided by Apollo the sun god.'" "[I]t was because of the [I]lluminati that Jackie Lacey was recalled and Gascon took office, and . . . the [I]lluminati [would] get him out."

Dr. Kojian referred to his past discussions with defendant and stated he had previously noted, among other things, defendant's significant mental illness history, treatment with numerous drugs, and multiple hospitalizations. In September 2015, defendant was considered incompetent to stand trial.

Dr. Kojian opined that defendant's mental state had not improved since the last time he interviewed defendant "some time ago"—presumably the September 14, 2021, interview for the mental health diversion report—and the doctor believed defendant continued to struggle from grandiose and persecutory delusions. Dr. Kojian did not believe defendant could "meaningfully or rationally cooperate with his attorney in the current matter." Accordingly, he opined that defendant "should be considered incompetent to proceed to trial/resentencing at this time."

Having received Dr. Kojian's competence report, the trial court held a competence hearing on July 21, 2022. The court

12

stated, "I think it's fair to say that . . . defendant does have a mental disorder" and a "significant history of mental illness."

The trial court noted that defendant had been diagnosed with schizophrenia for which he had been prescribed numerous psychiatric medications and that defendant had a significant history of methamphetamine use. It further noted that Dr. Kojian described defendant talking about "things that [were] somewhat delusional." The court recalled from defendant's trial defendant "talking about several things." Lately, defendant had been talking about the Knights Templar and the Illuminati.

Nevertheless, the trial court found, "[F]rom the beginning, and even to this date, [defendant] does understand the court process. He knows more or less why he's here. He knows he's here for a mental health diversion issue that's still pending. He knows there's a sentencing issue, and he obviously knows about the competency issue here today. And all of these issues that he's well aware of, he's well aware of who the district attorney is. He knows his counsel. He knows who I am, the judge, and the function that I'm performing here today and that we're all performing."

Defendant asked to say something, and the trial court allowed him to do so. Defendant said, "Okay, tell me if this make sense. I been traveling through every degree of the pyramid until I rest the cast stone. Which, by me doing so, I became illuminated. I came all the way from the pyramids of Egypt with my camel and my staff. My journey has been long and I am weary, but I know who the father is and who's son. Tell me does that make sense?"

The trial court responded, "I understand what you're saying as far as some of the things you believe are real to you.

13

But you also know why we are here. You know this is a courtroom." Defendant replied, "Your Honor, I know exactly why I'm here."

As to whether defendant would be able to assist defense counsel, the trial court disagreed with Dr. Kojian. The court explained, "I think it's partly because Dr. Kojian, when he does these reports, it's usually done for pretrial before there's a trial. And he's thinking with the mind whether . . . defendant can assist in the defense for trial. And I think that's a big difference then [*sic*] where we are at at this stage. [¶] We're at the stage where the defendant has already had his trial. He's already been convicted, and now we have these other things that are on the table which is the issue of the mental health diversion and also sentencing issues that were raised."

The trial court believed there was "not really much" for defendant to assist counsel with and the mental health diversion decision would be made primarily based on Dr. Kojian's reports and "on our interactions with . . . defendant." Although defendant would have an opportunity to be heard, the court believed it could make the diversion decision without very much input from him.

The trial court stated that defendant could inform defense counsel if there was any "new information" the court should consider and thought it was "clear" that defendant could assist defense counsel "to the extent he's needed for any competency hearing."[7] Further, the sentencing issues were "pretty straight forward as well"—the court only had to decide whether to strike

---

[7]     As the court was conducting a competency hearing, it is unclear what it was referencing.

the section 667, subdivision (a) priors as it was going to strike the section 667.5, subdivision (b) priors "automatic[ally]."

The trial court found defendant to be competent. The court stated that based on the information in Dr. Kojian's report and on the court's opportunity to observe defendant "from the very beginning during pretrials and during the entire trial," it believed that defendant was "still at a level" where he was "aware of the proceedings." The court stated further, "He understands what's going on here, and he's had the ability to assist counsel, and he, I believe, he still has the ability to assist counsel to the extent that it's going to be necessary."

The trial court then addressed mental health diversion and found defendant did not qualify and was unsuitable. The court agreed with Dr. Kojian that because defendant suffered from schizophrenia and stimulant use disorder, he satisfied the first diversion criterion. The court disagreed with Dr. Kojian's opinion that defendant did not satisfy the second diversion criterion, finding that defendant's mental disorder probably "was a significant factor in the attack on the victim."

As to the third diversion criterion, the trial court agreed with Dr. Kojian that defendant's symptoms motivating the criminal behavior likely would not respond to mental health treatment. The court observed that defendant had "struggled with medication and treatment and has been noncompliant in the past." Moreover, defendant "continues to self-medicate with the use of methamphetamine, and he doesn't take his prescriptions. And even when he is taking his medication, he[] still has exhibited these, this mental disorder. In other words, he's still under the—he's still acting schizophrenic and still having the high-psychotic episodes including what happened in this

15

particular case. So I think that's something that I'm not sure that he would respond to mental health treatment."

Defense counsel objected to the trial court's finding on the third diversion criterion, arguing that defendant should not be responsible for the medical community's inability to come up with an effective regimen or treatment. The court explained that the issue was whether defendant would be able to undergo treatment in the community that would be effective enough to keep him from re-offending or committing violent acts against himself or others.

The trial court found defendant met the fourth diversion criterion. It noted this criterion was whether defendant consented to diversion and waived his right to a speedy trial. Although a speedy trial was "not on the table," the court nevertheless found this criterion met "in the sense that [defendant] would be willing to participate in mental health treatment and diversion."

As to the fifth diversion criterion, the trial court was equivocal. It stated, "Whether . . . defendant agrees to comply with treatment as a condition of diversion; that's the issue. Even though he may want to comply, whether he would be able to comply is another question."

Finally, as to the sixth diversion criterion—whether defendant posed an unreasonable risk of danger to public safety if treated in the community—the trial court stated, "This was a vicious attack on the victim, and the victim suffered extensive injuries. The attack on her where she raised her arms to prevent . . . defendant from slicing her face or her neck; that was the testimony. And as a result, her hand almost got completely

16

severed off from the box cutter. And she had and required extensive surgery."

The trial court believed this was a "very serious case" because defendant had been convicted of attempted murder and other charges. "[T]he problem" the court saw was that although defendant might want to comply with treatment, it was not convinced he was capable of complying. The court believed that "if [defendant] was released [to] the community, he would once again resort to the ways that he's known while he's been out in the community, and that is the heavy use of methamphetamine to self-medicate. And that use just aggravates his mental health illness. And it leads to these types of episodes that occurred in this case. And the court's fear is that it would occur again."

The trial court found that defendant did not qualify for mental health diversion. It also found defendant was not suitable for diversion because it believed, based on the severity of his mental health issues, he would not be able to be treated in the community.

## III. DISCUSSION

### A. *Competence*

Defendant argues insufficient evidence supports the trial court's finding that, contrary to Dr. Kojian's opinion, he was competent to proceed with the hearings on remand. We assume for argument's sake that the law on competency to stand trial applies at a post-trial hearing to consider a defendant's eligibility for mental health diversion and resentencing. Sufficient evidence supports the court's finding.

17

"'The criminal trial of a mentally incompetent person violates due process. [Citation.] However, a defendant is not incompetent if he can understand the nature of the legal proceedings and assist counsel in conducting a defense in a rational manner. ([Citation]; § 1367.)' [Citation.] A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence by the party contending he or she is incompetent. [Citing, *inter alia,* § 1369, subd. (f) & Cal. Rules of Court, rule 4.130(e)(2).]" (*People v. Blacksher* (2011) 52 Cal.4th 769, 797 (*Blacksher*).) A trial court may rely on its own observations of the defendant in finding that he or she did not rebut the presumption of competence. (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514.) "In reviewing on appeal a finding of competency, 'an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence.' [Citation.]" (*Blacksher, supra,* 52 Cal.4th at p. 797.)

In finding defendant competent, the trial court stated, "I have had the benefit of observing [defendant] from the very beginning during pretrials and during the entire trial, and he is still at a level where I believe he is aware of the proceedings. He understands what's going on here, and he's had the ability to assist counsel, and he, I believe, he still has the ability to assist counsel to the extent that it's going to be necessary." Substantial evidence supports the court's finding.

At the February 18, 2022, hearing at which the trial court ordered defendant to undergo a competency evaluation, defendant demonstrated that he understood the nature of the proceedings. The court asked defendant, "[D]o you know why

you're here today?" Defendant responded, "Yes, I know why I'm here. [¶] . . . [¶] For mental health diversion and resentencing."

Later, in that hearing, the trial court said to defendant, "Okay, so I think you pretty much understand as far as why you're here. The court is obligated to consider mental health diversion for you. That was, when the case went up on appeal, your case went up on appeal, that court directed us to consider you for mental health diversion. So you understand that, right?" Defendant responded, "Yes, sir."

Defendant's knowledge of the nature of the proceedings was further demonstrated when the trial court told him that it would like the proceedings to go forward and defendant interjected stating, "We can go forward. I have no problem with abiding by anything that you set forth any type of guideline. All I'm asking, you know, to give me an opportunity to prove myself."

Defendant's statement, reported in Dr. Kojian's competence report, that he was in prison but had been brought to county jail for resentencing and consideration for mental health diversion further supports the trial court's conclusion that defendant understood the nature of the proceedings. Similarly, the colloquy between the trial court and defendant at the post-report competence hearing also supports the court's conclusion. When court said that defendant knew why they were "there" and knew they were in a courtroom, defendant replied, "Your Honor, I know exactly why I'm here."

Finally, as for defense counsel's assertion that it was difficult for him to communicate with defendant about substantive matters, defendant explained that he did not want to communicate with defense counsel because defense counsel undermined his character and spoke to him as if he was trash.

19

"'[T]he test, in a section 1368 proceeding, is competency to cooperate, not cooperation.'" (*People v. Clark* (2011) 52 Cal.4th 856, 893, quoting *People v. Superior Court (Campbell)* (1975) 51 Cal.App.3d 459, 464.)

B. *Section 1001.36 Mental Health Diversion*

Defendant contends the trial court abused its discretion when it denied mental health diversion. The court did not err.

Trial courts have broad discretion in determining whether a defendant is a good candidate for mental health diversion. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448 (*Moine*).) We review a court's decision to deny mental health diversion for an abuse of discretion. (*Ibid.*) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation]." (*Id.* at p. 449.)

In June 2018, the Legislature enacted sections 1001.35 and 1001.36, creating a procedure by which trial courts have discretion to grant pretrial diversion to certain defendants with mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 624, 626.) "As originally enacted, section 1001.36 provided that a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the

20

defendant will not pose an unreasonable risk of danger to public safety if treated in the community. (Former § 1001.36, subd[s]. (b)(1)–(6)[; current subds. (b)(1)(A)–(F)][8].) . . . [¶] If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion. (§ 1001.36, subds. (a), (b)(3) & (c)(1).)" (*Id.* at pp. 626–627.)

The trial court denied mental health diversion because it found that defendant's symptoms would not respond to mental health treatment and defendant posed an unreasonable risk of danger to public safety if treated in the community. For its finding that defendant's symptoms would not respond to mental health treatment, the court relied on Dr. Kojian's report. Based on that report, the court found that defendant struggled with medication and treatment, had been noncompliant with treatment, and continued to self-medicate with methamphetamine. Moreover, even when defendant took his medication, he still exhibited schizophrenic behavior. Dr. Kojian's report is substantial evidence supporting the court's finding, and the court did not abuse its discretion.

For its finding that defendant posed an unreasonable risk of danger to public safety if treated in the community, the trial

---

[8]     At the time the trial court denied diversion, section 1001.36 had been further amended, but retained these six factors. (Former § 1001.36, subd. (b)(1)(A)–(F); Stats. 2022, ch. 38, eff. June 30, 2022.)

court relied on the evidence adduced at defendant's trial for attempted murder and Dr. Kojian's report. (§ 1001.36, subd. (b)(1)(F) [in considering the risk of danger posed, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate"].) According to the court, defendant attacked Treopia viciously and almost cut off her hand, causing Treopia to have extensive surgery. The court believed that if defendant was released to the community, he would continue his heavy use of methamphetamine to self-medicate which would aggravate his mental health illness and lead to the "types of episodes that occurred in this case. And the court's fear is that it would occur again." That is, the court was concerned that defendant would commit another attempted murder—i.e., a "super strike." (*Moine, supra*, 62 Cal.App.5th at p. 449 [attempted murder is a "super strike"].) The evidence adduced at defendant's trial and Dr. Kojian's report are substantial evidence supporting the court's finding, and the court did not abuse its discretion.

C.    *AB 518 and SB 81*

Defendant contends the trial court abused its discretion by failing to consider AB 518[9] and SB 81,[10] which became effective on January 1, 2022, at his July 21, 2022, resentencing hearing. He concludes the court failed to consider these bills because neither the court nor the parties mentioned them at resentencing.

"Absent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.)  We do not consider the court's silence as reflecting that it did not understand the law.

---

[9]    Effective January 1, 2022, AB 518 amended section 654 by removing the requirement that a defendant be punished under the provision providing for the longest term of imprisonment, and granting trial courts the discretion to impose punishment under any applicable provision.  (*People v. Fugit* (2023) 88 Cal.App.5th 981, 995.)

[10]    Effective January 1, 2022, SB 81 amended section 1385 to specify factors that trial courts must consider when deciding whether to strike an enhancement from a defendant's sentence in the interest of justice.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)  Effective June 30, 2022, Assembly Bill No. 200 further amended section 1385 in ways not relevant here.  (Stats. 2022, ch. 58, § 15.)

## IV.   DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


                                KIM, J.


We concur:


        BAKER, Acting P. J.


        MOOR, J.

24